IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT LAMONT IRELAND                    *

         v.                                    *        CIVIL ACTION NO. WDQ-08-3006

MARY ANN SAAR                            *
FRANK C. SIZER
RONALD HUTCHINSON                        *
JAMES V. PEGUESE
PATRICIA ALLEN                           *
W. MILLER
JAMES SMITH                              *
WAYNE HILL
DEHAVILAND WHITAKER                      *
SGT. CRYSTAL HARRIS
OFC. REGINALD WALKER                     *
JOHN A. ROWLEY
LERHMAN DOTSON                           *
SIMON WAINWRIGHT
DWIGHT JOHNSON                           *
DONNA HANSEN
TYRONE CROWDER                           *
KIM WILSON
ANGEL GONZALES                           *
CASE MANAGEMENT (C.M.S.)
    SUPERVISOR J.C.I.                      *
MARIA FISHER
DAWN TRIPP                               *
JACQUELINE PRICE
MARVIN ROBBINS                           *
SCOTT S. OAKLEY
C.M.S. DIRECTOR MEDICAL                  *
 SERVICES AT M.C.A.C.
ZERABRUCK TWELDE, M.D.                   *
GARY D. MAYNARD
J. MICHAEL STOUFFER                      *
                           ***

MEMORANDUM

Procedural History

Robert Lamont Ireland's original 42 U.S.C. § 1983 Complaint was filed on November 10,

2008.   Amended Complaints were filed on January 5 and 7, 2009.   Ireland raises numerous complaints about his November 2005 transfer to the Maryland Correctional Adjustment Center ("MCAC"), asserting that it was retaliatory, done without procedural due process, and subjected him to atypical conditions and posed a significant hardship.[1]   He further complains that the administrative remedy procedure ("ARP") coordinators interfered with his access to courts by dismissing or "withholding" his ARPs.   Ireland also alleges that healthcare personnel failed to provide him constitutionally adequate treatment for kidney stones and injuries to his neck and back from a slip and fall.   Finally, he complains of his transfer from MCAC to the North Branch Correctional Institution ("NBCI").   *See* Paper Nos. 1, 5 & 6.

The medical and state Defendants have filed unopposed Motions to Dismiss or for Summary Judgment.[2]   Paper Nos. 23 & 37.   The dispositive Motions will be treated as motions for summary judgment and, for the following reasons, will be granted without a hearing.   *See* Local Rule 105.6. (D. Md. 2009).

## Standard of Review

Fed. R. Civ. P. 56(c) provides that:

> [Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

[1]   Ireland claims that: MCAC has no educational or rehabilitation programming; the lights are on 24 hours a day; recreation, showers, food, and telephone access are restricted; he had limited access to legal materials and visitation; there was inadequate medical care; and inmates were required to wear full restraints (during out-of-cell movements).

[2]   Ireland was notified of the dispositive filings pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) and was granted several extensions to file responsive pleadings.  Paper Nos. 24, 25, 27, 32, 33,

This does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in h[is] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (*quoting Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).  The court has an obligation to ensure that factually unsupported claims and defenses do not go to trial.  *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U. S. 317, 323-24 (1986)).

Discussion

---

39, 40, & 43-45.  No oppositions have been filed.

Medical Care

Facts

The unopposed affidavit and medical records presented by the medical Defendants shows that Ireland has a history of a gunshot wound, tension headaches, and renal calculi (kidney stones). He was transferred to MCAC in November of 2005, and was evaluated by Dr. Cherelle Reddick-Lane for his complaint of bad abdominal pain.   He had previously undergone a renal sonogram in September 2005 and had been assessed by an urologist in October 2005.   The evaluation revealed minimal flank tenderness, a possible sign of renal problems.     Dr. Reddick-Lane requested a collegial review from Wexford Health Sources, Inc., the utilization review contractor for the Maryland Division of Correction, for a CT scan of Ireland's abdomen and pelvis and a urology follow-up consultation.   She also prescribed Naprosyn for pain.   The Wexford collegial review recommended a trial of the medication Ultram.   On January 2, 2006, Reddick-Lane evaluated Ireland for a follow-up on his kidney stones.   She noted that Ireland indicated that he was still having pain, that he "passed a large stone the other day," and that the medication helped to relieve his pain, but he wanted the stones removed.   Reddick-Lane renewed the Ultram prescription and noted in the medical chart that she would discuss Ireland's case in collegial review to determine further treatment.   A request for an off-site urology consultation was also submitted.

On January 26, 2006, Ireland submitted a sample for urinalysis.   It was negative for occult blood.   On February 9, 2006, Ireland was referred to the University of Maryland Medical  Center ("UMMC")  for CT scans of the abdomen and pelvis.   On March 3, 2006, Ireland's prescription for Ultram was discontinued, and he was prescribed Naprosyn for pain.     On April 3, 2006, Ireland complained of pain in the left lower quadrant of his abdomen. Dr.  Zerabruck Tewelde counseled

4

Ireland about his condition and advised him to seek a follow-up appointment in four weeks.

CT scans of Ireland's abdomen and pelvis were performed on April 25, 2006. The scans revealed small renal stones in both kidneys and some small stones in the gallbladder. Dr. Tewelde examined Ireland on May 8, 2006. He complained of back pain and burning on urination. Tewelde's assessment, however, was that Ireland did not appear to be in any distress and showed no obvious signs of pain or flank tenderness. He advised Ireland to stay well-hydrated, that he would obtain the results of the sonogram, and that Ireland was to follow-up in four weeks.

On the afternoon of May 25, 2006, a nurse responded to a call from Ireland's housing unit indicating that Ireland had fallen while being escorted to his cell. He was found shackled and lying on his side on the floor. He was responsive to questions and stated that he could not stand up. Ireland was placed on a stretcher and brought to the MCAC dispensary. The nurse's examination revealed no lacerations, bruising, contusions, bleeding, or evidence of fracture. Tewelde was notified and advised the nurse to have Ireland escorted back to his cell by stretcher and to re-evaluate him as necessary. Tewelde also advised the nurse that if Ireland could not get up on his own by that evening he should be notified and he would consider sending Ireland to the "emergency department." Tewelde contacted the housing unit that evening to check on Ireland's condition. Ireland was found lying on his bed. Two hours later when Tewelde made a follow-up call, he was told that Ireland was still lying on his bed and indicated that his back was very "tense," and he could not get up by himself. Tewelde ordered Ireland sent to UMMC by ambulance.

While at UMMC, Ireland underwent x-rays of his skull, chest, abdomen and left ankle, CT scans of his head and cervical spine, and an MRI of his head and brain. Test results revealed a scalp laceration and contusion without evidence of acute intracranial hemorrhage. No other injuries were

noted.   Ireland was discharged to MCAC on the evening of May 26, 2006.    Upon his return to

MCAC, Ireland was able to walk without difficulty.   Ireland indicated that he was sore, but he had

no visible injuries and no complaint of headache.   He received Motrin for pain relief.   On May 30,

2006, Ireland submitted a urine sample for testing; the results were negative for signs of blood or

other abnormalities.

Ireland was again evaluated by Dr. Tewelde on June 11, 2006 in the Chronic Care Clinic.   He

demanded  physical  therapy  ("PT")  and  Motrin  for  pain.     He  lectured  Tewelde  on  the  proper

protocols.   Tewelde's assessment was that Ireland did not appear to be in any distress, was able to

sit on the table and jump off, and did not show any sign of tenderness when his back was palpated.

He did not believe that Motrin was indicated at that time, and he advised Ireland to avoid non-

steroidal anti-inflammatory drugs ("NSAID"), such as Motrin, because they could contribute to his

kidney stones.

On June 26 and 30, 2006, Ireland submitted a sick-call encounter form stating he had not

been seen by a back therapist despite a UMMC recommendation.   The nurse who evaluated Ireland

on both dates observed that he had no problem walking without pain.

On July 4, 2006, Ireland complained of burning on urination, constipation, and "kidneys

tightening up."   He also complained of low back pain, stiff neck and headaches behind the left eye.

Ireland was scheduled for an appointment with Tewelde on July 17, 2006.   Tewelde observed

minimal tenderness of the lower back and ordered PT.   On August 24, 2006, Ireland underwent a PT

evaluation.   The therapist recommended that Ireland participate in PT one to two times a week.   On

August 25, 2006, he told the therapist that the on-site PT services were not adequate for his

condition.

On September 15 and 29, 2006 and October 15, 2006, Ireland complained of back and shoulder pain and headaches.   He further complained that  he was no longer receiving PT.   He was given Tylenol and was scheduled to see a physician for follow-up as to the need for PT.   On November 8, 2006, Dr. Reddick-Lane re-evaluated Ireland for his back pain complaint.   He was referred for another PT evaluation.   Ireland was re-evaluated by a physical therapist on January 4, 2007.  The therapist observed that Ireland's range of motion ("ROM") was within normal limits and the therapist was unable to reproduce Ireland's low back pain during the examination.  Ireland was scheduled for PT one to two times a week.

Ireland offered no further complaints of back pain or kidney stones while incarcerated at MCAC and under the care of Tewelde.   Ireland was transferred to NBCI in March 2007.   While at NBCI, Ireland complained of kidney stones and back pain.   He refused Tylenol for pain relief.   He also requested additional PT, despite being discharged from PT on February 27, 2007, with no functional deficits.   On June 1, 2007, he informed a nurse practitioner that he was feeling fine and his kidneys did not bother him anymore.

Based upon this record, the Court concludes that no constitutional deprivation has been demonstrated.  As an inmate claiming an Eighth Amendment denial of medical care, Ireland must prove that he has a serious medical condition.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998).   If this is shown, Ireland must then prove deliberate indifference on the part of prison officials or health care personnel.  *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (claims of inadequate medical care are subject to the "deliberate indifference" standard of *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very

purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* at 837. Health care staff are not, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844; *see also Johnson v. Quinones*, 145 F.3d at 167. In addition to establishing that personnel acted with deliberate indifference to his serious medical needs, to succeed on a § 1983 damage claim for violation of the Eighth Amendment, Ireland must show that serious injury resulted from the Defendants' conduct. *See Lawrence v. Virginia Dep't of Corrections*, 308 F.Supp.2d 709, 720 (E. D. Va. 2004).

The unrefuted evidence is that Ireland has received conservative assessment and treatment for his kidney stones and slip and fall injuries. He has been evaluated by nurses, physicians and physical therapists and received diagnostic tests (CT scans, MRIs, x-rays, NSAIDS, and PT). Ireland's dissatisfaction with treatment amounts to nothing more than a disagreement between medical staff and an inmate as to a course of treatment, and does not rise to a constitutional injury. *See Davis v. Greene*, 2009 WL 3064106, at *13 (S.D. W.Va. Sept. 18, 2009).

Allegations Concerning MCAC & NBCI

Facts

There is no dispute that some 60 inmates were transferred from the Jessup Correctional Institution ("JCI") to MCAC and then to NBCI as a part of "Operation North Star" because of increased violence, lock-downs, and tension at JCI.[3] Ireland was identified as one of the 64 inmates

---

[3]     JCI was formerly known as the Maryland House of Correction Annex or "MHCX."

who, after investigation, were found to have some connection to gang activity, had a bad adjustment history, had possessed contraband, or had previously compromised security.

The state Defendants have testified that on November 7, 2005, Ireland was transferred to MCAC under the guidelines of the Operation North Star project and advised that he had been temporarily transferred to MCAC to await transfer to NBCI.   He was not transferred with his property, but was given soap, toothpaste packs, toothbrush, deodorant, shampoo packs, wash cloth, towel, writing paper, envelopes, and an ink pen.   On March 8, 2007, Ireland was transferred from MCAC to NBCI, where he was assigned to administrative segregation until March 28, 2008, when he was reassigned to general population.   On January 12, 2009, he was transferred to the Western Correctional Institution, where he was housed as a general population inmate until March 19, 2009, when he was assigned to administrative segregation because of threats from other inmates.

## Analysis

Prisoners do not have a constitutional right to access programs or to demand to be housed in the prison of their choice.   "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976).   Under *Sandin v. Conner*, 515 U.S. 472 (1995), a liberty interest may be created when state action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" without regard to mandatory language in prison regulations.  515 U.S. at 484.  The due process inquiry must focus on the nature of the deprivation alleged and not on the language of particular prison regulations.   *Id*. Under *Sandin*, a liberty interest is not implicated when prisoners are placed on administrative segregation.   *See Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997); *Reffitt v. Nixon*, 917 F. Supp.

409, 413 (E.D. Va. 1996).   It is not "atypical" for inmates to be placed on administrative segregation

for any number of reasons.  *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983).  Ireland has not shown

that the conditions of segregation were significantly more onerous than those of general population.

*See Beverati,* 120 F.3d at 504 (conditions of administrative segregation at Maryland Penitentiary);

*Knox v. Lanham*, 895 F. Supp. 750, 758-59 (D. Md. 1995) (administrative segregation at Eastern

Correctional Institution).

Assuming that the limitation on Ireland's movement and the curtailment of out-of-cell time

was more restrictive after his transfer to MCAC and NBCI, such conditions are not atypical of prison

life.  "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be

grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*,

452 U.S. 337, 347 (1981).  As evidenced by the absence of any injuries, Ireland's assertions about

the conditions of confinement do not demonstrate wanton and unnecessary infliction of pain. *See

Strickler v. Waters*, 989 F. 2d 1375, 1381 (4th Cir. 1993) (absence of serious or significant injury

establishes prisoner not subjected to cruel and unusual punishment).

There is no constitutional requirement that a legitimate penological justification be made for

a transfer to another prison, even when the conditions at the transferee prison are more restrictive.

*See Meachum v. Fano*, 427 U.S. at 228-229.  If applicable regulations were not followed in the

transfer, that non-compliance would not establish a due process  violation.  *See Frazier v. Hesson*,

40 F.Supp.2d 957, 965 (W. D. Tenn. 1999).  The escalating gang-related violence which resulted in

the death of an inmate was an adequate reason for transferring a large group of inmates from JCI.

This Court will not second-guess the security measures taken by experienced correctional officials in

the face of the violence at JCI.

Prisoners have a constitutionally protected right of access to the courts.  *See Bounds v. Smith*, 430 U. S. 817, 821 (1977).  However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

To the extent that Ireland was temporarily deprived of access to legal material, he has shown no harm from that deprivation.  A prisoner wishing to demonstrate a Fourteenth Amendment burden on his right of access to the courts "must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'"  *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) *quoting Lewis*, 518 U. S. at 355.  "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349.  There has been no allegation that a deadline was missed, or Ireland was unable to pursue a meritorious claim. [4]

To the extent that Ireland claims that his property was destroyed or lost during his transfers, he has failed to state a constitutional claim.  In the case of lost or stolen property, sufficient due process is afforded an inmate if he has access to an adequate post-deprivation remedy.  *See Parratt*

---

[4]       In his Complaints Ireland seemingly states that his lack of access to a bona fide ARP grievance process resulted in the dismissal of his civil rights complaint in *Ireland v. Peguese, et al.,* Civil Action No. WDQ-05-1387 (D. Md.).  The Court has examined the ruling in that case and finds no link between the dismissal of that case and the alleged problems Ireland experienced with the ARP process while confined at MCAC or NBCI.

*v. Taylor*, 451 U. S. 527, 542-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U. S. 327 (1986).  The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post-deprivation remedy.[5]  *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[6]

Conclusion

As Ireland's constitutional rights were not abridged, the Defendants are  entitled to summary judgment.

Date:  <u>February 4, 2010</u>.                                            <u>        /s/         </u>
                                                                         William D. Quarles, Jr.
                                                                         United States District Judge

---

[5]        Ireland may seek relief through the Maryland's Tort Claims Act and the Inmate Grievance Office.

[6]        *Juncker* relied on *Parratt* dismissing a plaintiff's due process claims.  Accordingly, although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post-deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property.